## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| **LEAH MYLES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 11 C 4795** |
| **v.** | ) | |
| | ) | **Magistrate Judge** |
| **MICHAEL J. ASTRUE,** | ) | **Maria Valdez** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

This action was brought under 42 U.S.C. § 405(g) to review the final decision of the Commissioner of Social Security denying Plaintiff Leah Myles' claim for Disability Benefits and Supplemental Security Income Benefits. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons that follow, Myles' motion for summary judgment [Doc. No. 21] is granted in part and denied in part. The Court finds that this matter should be remanded to the Commissioner for further proceedings.

## BACKGROUND

### I. PROCEDURAL HISTORY

On August 28, 2007, Plaintiff Leah Myles ("Plaintiff," "Myles," or "Claimant") filed an application for a period of disability and disability insurance benefits, as well as an application for supplemental security income. (R. 9.) Plaintiff alleged

disability beginning August 9, 2007 due to mini-stroke, back pain, diabetes, suicidal ideation, depression, and arthritis in her back, wrists, and shoulders. (R. 169.) Plaintiff's claims were denied initially on December 13, 2007, and upon reconsideration on April 1, 2008. (R. 9.) On April 22, 2008, Plaintiff failed a timely request for a hearing. (*Id.*) Plaintiff, represented by counsel, testified at a video teleconference hearing held on January 29, 2010. (*Id.*) Also appearing and testifying at the hearing was an impartial vocational expert, Glee Ann Kehr. (*Id.*)

On February 19, 2010, the ALJ denied Plaintiff's claim and found her "not disabled" under the Social Security Act. (R. 16.) The Social Security Administration Appeals Council denied Plaintiff's request for review on May 26, 2011. (R. 1.) The ALJ's decision thus became reviewable by the District Court under 42 U.S.C. § 405(g), *see Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

## II.  FACTUAL BACKGROUND

### A.  <u>Plaintiff's Background and Testimony</u>

Plaintiff was born on September 25, 1951, and was fifty-six years old on August 9, 2007, the date in which she claims her disability period began. (R. 135.) Plaintiff claims that chronic back pain, headaches, and other ailments have prevented her from working since July 2007. (R. 26.) Before Plaintiff's alleged disability onset date, she was a shipping specialist for a telecommunications company. (R. 170.) Plaintiff has been prescribed the following medications: Ambien, albuterol, amitriptyline, Altace, hydrocodone, fluoxetine, Lexapro, Lidoderm, metformin, nabumetone, Seroquel, clonazepam, citalopram, tizanidine, tramadol,

2

and trazadone. (R. 174, 362-63.) Plaintiff has no medical insurance, (R. 31), and no unemployment insurance benefits. (R. 26.) Plaintiff receives food stamps and one hundred dollars per month from the state. (R. 25.) Plaintiff was evicted from her apartment and lives with her sister, (R. 34), does not own a car, (R. 25), and depends on her friends and siblings for much of her needs. (R. 25, 34-36).

Plaintiff testified that she worked as a shipping specialist for ten years before she quit because of her inability to perform her job duties. (R. 26.) Plaintiff's duties included picking, pulling and packing orders for customers, driving forklifts, and loading trucks. (*Id.*) Plaintiff claimed that she stopped working because the workload was too heavy and the hours were long. (R. 28.) She testified that she could not stand for long periods of time and lift seventy-five pounds regularly, as required by her position. (*Id.*)

Plaintiff explained that she lives with her sister. (R. 34.) When asked what household chores she is able to complete, Plaintiff said that she is able to cook and keep her room together. (R. 36.) Plaintiff testified that her brother and sister help her with most of the chores. (R. 32-37.) When asked what she does with most of her days, Plaintiff explained that she sleeps a lot because her medications put her to sleep. (R. 39.) Plaintiff also said that she "sits around" and "walks around the block." (R. 40.)

When questioned by her attorney, Plaintiff testified that she had suffered a stroke, and that a 2005 CAT scan taken of her brain revealed an abnormal signal. (R. 43.) Plaintiff claimed that she experiences frequent headaches and regular

3

migraine headaches. (*Id.*) Plaintiff testified that she has problems with her hips, and that she has problems with her back "everyday, all day." (R. 45.) Plaintiff also testified that she has arthritis through most of her body, (R. 47), she is regularly fatigued, (R. 48), she experiences shortness of breath, (R. 47), and she suffers from anxiety and depression. (R. 38).

**B.** **Medical Evidence**

On May 23, 2005, Plaintiff underwent a chest x-ray. (R. 275.) The results showed no abnormalities in the chest, as well as no active lesions in the lungs. (*Id.*) The heart, aorta, diaphragm, and hilus showed no significant abnormality. (*Id.*) On May 24, 2005, Plaintiff underwent computerized cranial tomography. (R. 277.) The results revealed that a small hypodense area in the right cerebellum had the appearance of an old lacunar infarction. (*Id.*) Because of the absence of previous examinations for comparison, follow-up studies, including magnetic resonance imaging (MRI) of the brain, was recommended. (*Id.*) On May 25, 2005, Plaintiff underwent an MRI of the brain. (R. 276.) A small area of abnormal signal was noted within the right cerebellar hemisphere. (*Id.*) The reporting physician, Dr. Thomas Hoess, reported that it may be due to an old infarct, trauma or infection. (*Id.*) On May 25, 2005, Plaintiff also underwent a Cardiolite Myocardial Perfusion Spect scan. (R. 273.) The examination revealed that both resting and post-stress images of the myocardium was unremarkable other than a slight breast artifact in the small anterior apical zone. (*Id.*) On February 7, 2006, an x-ray of Plaintiff's chest revealed that her heart was enlarged, her aorta "tortuous," and her lungs "essentially clear."

(R. 272.) Findings from a February 9, 2006 Cardiolite Myocardial Perfusion Spect scan were unremarkable "other than slight breast and bowel artifacts. Gated images demonstrate normal systolic myocardial thickening with a normal left ventricular ejection fraction of 57%." (R. 268.) On May 25, 2006, Plaintiff underwent an MRI of her hip. (R. 297.) The findings revealed that her osseous structures were intact at the time of the examination. (*Id*.) An April 24, 2007 bone density and vertebral assessment report indicates normal findings for Plaintiff's AP spine, femoral neck, total hip, total forearm, 1/3 forearm, and UD forearm, as well as normal findings for all of Plaintiff's vertebral levels. (R. 263.)

The record reveals that from January 25, 2005 until May 14, 2007, Plaintiff saw Dr. Debra Zack at St. Catherine Hospital. (*See* R. 226-62.) On April 8, 2005, Dr. Zack made note of Plaintiff's obesity, depression, fatigue, and anemia. (R. 260.) Dr. Zack prescribed Wellbutrin XL for Plaintiff's depression. (*Id*.) On May 4, 2005, Plaintiff complained of fatigue, and pain in her lower back, right hip, right thigh and groin. (R. 257.) Plaintiff claimed that the pain was constant. (*Id*.) Dr. Zack noted Plaintiff's back pain and reported that Plaintiff's Relafen prescription was "not working." (R. 258.) She also prescribed Cymbalta for Plaintiff's depression. (*Id*.) On September 9, 2005, Plaintiff complained of back pain. (R. 249.) Dr. Zack noted Plaintiff's obesity, anemia, and hyperlipidemia. (R. 250.) On October 14, 2005, Dr. Zack noted Plaintiff's hyperlipidemia, acute bronchitis, and asthma, and prescribed albuterol. (R. 248.) On January 20, 2006, Dr. Zack noted Plaintiff's asthma again. (R. 246.) On April 14, 2006, Plaintiff complained of pain in her groin, hip and leg,

and reported that she was "unable to stand." (R. 243.) On June 13, 2006, Plaintiff complained of weakness, headache, and vomiting. (R. 239.) On October 24, 2012, Plaintiff reported that her fatigue had improved. (R. 235.) On January 29, 2007, Plaintiff complained of leg pains as well as cold symptoms. (R. 231.) On May 14, 2007, Plaintiff reported stress and anxiety; she also explained that she had "no energy," and did not "feel like doing anything." (R. 229.) Dr. Zack noted Plaintiff's obesity, fatigue, hyperlipidemia, and referred Plaintiff to Dr. Arif based on Plaintiff's depression. (R. 230.)

From February 14, 2006 until April 13, 2007, Plaintiff saw Dr. Keith Reich. (*See* R. 282-88.) On February 14, 2006, Plaintiff complained of lower back pain, and right hip pain around the groin area. (R. 288.) Plaintiff also reported chest pain, breathing problems, stomach pain, joint pain, headaches, depression, anxiety, and anemia. (R. 289.) Dr. Reich noted that multiple co-morbid conditions, and diagnosed Plaintiff with rotator cuff tendonitis, diabetes, GERD, and anxiety. (R. 288.) Dr. Reich diagnosed physical therapy, increased socialization, and Ambien CR. (*Id*.) On May 23, 2006, Plaintiff complained of increased hip and groin pain, as well as vision problems, stomach pain, joint pain, headaches, depression, anxiety, and anemia. (R. 286-87.) Dr. Reich reported that Plaintiff had a flexion restriction on her right hip, and determined that Plaintiff "needs to see a pain specialist" because her Vicodin intake could lead to liver damage. (R. 286.) Dr. Reich also referred Plaintiff for an MRI to check for bursitis and indicated that Plaintiff may need physical therapy or injections for pain. (*Id*.) On September 6, 2006, Plaintiff reported that she was

6

experiencing "a lot of pain." (R. 285.) Plaintiff also reported problems with stomach pain, joint pain, headaches, depression, and anemia. (*Id.*) On April 13, 2007, the doctor reported that Plaintiff suffered from multiple joint pain, arthritis, and muscle pain and spasms. (R. 283.)

Plaintiff attended therapy sessions at Daybreak Behavioral Health Clinic at St. Catherine's Hospital from May 31, 2007 until July 31, 2007. (*See* R. 300-13.) She saw Ms. Carmen Rodriguez, a therapist, and Dr. A. Arif, a psychiatrist. (*Id.*) A May 15, 2007 progress report notes Plaintiff's anxiety attacks, insomnia, diabetic attacks, tearfulness, and depression. (R. 305.) A May 21, 2007 progress report notes Plaintiff's fatigue, (R. 304), and a June 4, 2007 progress report notes Plaintiff's extensive crying, "significant depression," and suicidal ideation. (*Id.*) On May 31, 2007, Ms. Rodriguez reported that Plaintiff was well-groomed, had a normal gait, that her thought process was goal directed, and that her thought content was appropriate. (R. 313.) Ms. Rodriguez also reported Plaintiff's depressed mood, flat affect, mild anxiety, and emotional and "very tearful" communication. (*Id.*) Ms. Rodriguez noted that Plaintiff denied being either suicidal or homicidal. (*Id.*) On June 4, 2007, Plaintiff complained of a very bad headache. (R. 312.) Plaintiff explained that she had suffered from headaches for as long as she could remember. (*Id.*) Plaintiff also complained about stress caused by her work and about her difficulty with her sleep patterns. (*Id.*) Ms. Rodriguez noted Plaintiff's depressed mood, flat affect, mild anxiety, and tearfulness. (*Id.*) On June 15, 2007, Plaintiff complained that she had no energy. (R. 311.) Ms. Rodriguez noted Plaintiff's

depressed mood, flat affect, moderate anxiety, and emotional speech. (*Id.*) On June 26, 2007, Dr. Arif diagnosed Plaintiff with major depressive disorder, anxiety, and insomnia. (R. 302.) A July 16, 2007 progress report notes Plaintiff's daytime grogginess and fatigue. (R. 303.) On July 17, 2007, Dr. Arif reported that Plaintiff was experiencing nightmares, and that Plaintiff still had "anxiety / depression, but less." (R. 301.) On July 19, 2007, Plaintiff reported that she was very sleepy. (R. 309.) Ms. Rodriguez noted Plaintiff's depressed mood, flat affect, mild anxiety, and reported that Plaintiff seemed tired and in pain. (Id.) On July 31, 2007, Dr. Arif reported Plaintiff's continued nightmares, acute anxiety, poor sleep, and increased stress at work. (R. 300.) On August 6, 2007, Plaintiff explained that she was "struggling with a lot of fatigue now." (R. 306.) Plaintiff also reported that it was very difficult for her to cope with the pressure she feels at work. (*Id.*) Ms. Rodriguez noted Plaintiff's depressed mood, flat affect, and mild anxiety. (*Id.*) Ms. Rodriguez also noted that Plaintiff was tired. (*Id.*)

On November 13, 2007, Dr. B. Saavedra performed a consultative examination of Plaintiff. (*See* R. 322-26.) Dr. Saavedra noted that Plaintiff was fifty-six years old and had experienced a mini-stroke about a year and a half prior to the examination. (R. 322.) She recounted Plaintiff's complaints of "constant headaches, tingling in fingers, shortness of breath, and tightness in the chest." (*Id.*) The doctor also mentioned that Plaintiff began experiencing back pain in 2000 when "she was thrown off a machine and landed on her back." (*Id.*) She reported that x-rays taken of Plaintiff's back and hip revealed a bulging disc and a hairline fracture in her

right hip. (*Id.*) Dr. Saavedra reported that Plaintiff underwent physical therapy on and off from 1995 to 2005 and had received three injections with no relief. (*Id.*) The doctor also reported that Plaintiff had been diagnosed with diabetes and was prescribed oral medication, but Plaintiff was "unable to buy it at this time." (*Id.*) The doctor also noted Plaintiff's diagnosis of depression, suicidal ideation, and arthritis that affected over 75% of her body. (*Id.*) Dr. Saavedra noted that Plaintiff saw a psychiatrist every two weeks but stopped because she no longer had any insurance. (*Id.*)

Dr. Saavedra reported that Plaintiff was fatigued and that "there is no chest pain but [Plaintiff] has shortness of breath on exertion due to bronchitis. (R. 323.) In terms of Plaintiff's nervous system, the doctor reported that "[t]here is no history of convulsions, fainting spells, but has weakness, dizziness, and poor balance. She suffers with frequent headaches but no exacerbating factors. . . . There is change in mood with suicidal ideations but no attempts, but no memory loss, or concentration." (*Id.*) Dr. Saavedra noted Plaintiff's obesity and reported that "[p]atient seemed very depressed during exam." (*Id.*) The doctor reported that Plaintiff's spine was normal, and that Plaintiff had full range of motion in the lumbar, cervical, and thoracic regions. (R. 324-25.) Dr. Saavedra stated that Plaintiff "has a normal gait. She is able to stoop and squat without difficulty." (R. 325.) Dr. Saavedra's impressions were the following: history of depression, diabetes, obesity, and history of chronic back pain. (R. 326.)

On November 26, 2007, Dr. Irena Walters performed a consultative mental status evaluation of Plaintiff. (*See* R. 316-19.) Dr. Walters reported that "there are no obvious signs of [Plaintiff] having had a mini-stroke." (R. 317.) In terms of Plaintiff's current level of functioning, Dr. Walters noted that Plaintiff said that she was able to groom, bathe, and dress herself, but she does not do these things some days because of back pain. (*Id.*) The doctor also noted that Plaintiff cooks about once a day but has trouble standing for any length of time. (*Id.*) Dr. Walters also reported that Plaintiff was able to vacuum, wash dishes, and do most other chores at her own pace. (*Id.*) The doctor noted that Plaintiff watches approximately eight hours of television per day. (*Id.*)

Dr. Walters reported that Plaintiff was "alert and oriented to person, place and time, being able to state her name, the date and the location of this office." (R. 318.) The doctor also reported that Plaintiff walked slowly and claimed that she used to use a cane. (*Id.*) Dr. Walters noted that Plaintiff has had self-harm thoughts since the age of seven, and that Plaintiff described her mood as "always being depressed." (*Id.*) She also noted Plaintiff's tearfulness, hopelessness, helplessness, fatigue, anxiety, loss of energy, loss of interest, and depressed mood. (*Id.*) Dr. Walters' diagnosed Plaintiff with depressive disorder, dysthymia, obesity, diabetes, a right hip problem, chronic back pain, sleep problems, and a history of partial stroke. (R. 319.)

On December 4, 2007, Dr. Fernando Montoya conducted a physical residual functional capacity assessment of Plaintiff. (*See* R. 328-35.) Dr. Montoya made the

following determinations: Plaintiff could occasionally lift fifty pounds, frequently lift twenty-five pounds, stand and/or walk for a total of about six hours in an eight-hour workday, and sit for a total of about six hours in an eight-hour workday. (R. 329.) Dr. Montoya reported that Plaintiff had full range of motion in all areas, a normal gait, full muscle strength in all areas, normal grip, reflexes and sensation. (*Id.*) The doctor also noted that Plaintiff was able to stoop and squat without difficulty. (*Id.*) Dr. Montoya concluded that Plaintiff had no postural limitations, no manipulative limitations, no visual limitations, no communicative limitations, and no environmental limitations. (R. 330-32.)

On December 10, 2007, Dr. J. Gange examined Plaintiff and completed a psychiatric review technique concerning her mental impairments. (*See* R. 336-48.) Dr. Gange concluded that Plaintiff had depressive disorder but that her mental impairment was not severe. (R. 339, 336.) In rating Plaintiff's functional limitations, Dr. Gange determined that Plaintiff has no restriction in her activities of daily living, mild limitations in maintaining social functioning, mild limitations in maintaining concentration, persistence, or pace, and no episodes of decompensation. (R. 346.) Dr. Gange reported that Plaintiff was alert and oriented at the time of the examination. (R. 348.) He also noted that she reported spells of tearfulness once or twice per month due to loneliness, as well as anxiety symptoms that were present three or four times per month. (*Id.*) Dr. Gange reported that Plaintiff's memory was good, her calculations were accurate, and her insight, judgment and fund of information were good. (*Id.*)

11

On March 7, 2008, Dr. B. Sheikh performed a consultative examination of Plaintiff. (*See* R. 350-54.) Dr. Sheikh noted Plaintiff's fatigue, shortness of breath on exertion, weakness, dizziness, poor balance, and daily headaches. (R. 351.) Dr. Sheikh reported that "[t]here is change in mood with suicidal ideations and attempted [suicide] in the past, but no memory loss or concentration." (*Id.*) Dr. Sheikh also reported that Plaintiff's spine had normal curvature in the cervical, thoracic, and lumbar spine, and noted that there were no anatomic deformities. (R. 352.) The doctor did report that there was spinous and paraspinal tenderness in the lumbar spine with restricted range of motion, but Plaintiff had full range of motion in the cervical and thoracic regions and full strength in all major muscle groups. (*Id.*) Dr. Sheikh noted that Plaintiff had a normal gait and was able to stoop and squat without difficulty. (R. 353.) In terms of Plaintiff's neurological state, Dr. Sheikh reported that Plaintiff was "[a]lert and oriented in person, place and time with normal speech, mood affect, insight and judgment." (*Id.*) The doctor also noted that Plaintiff's coordination and sensation were normal. (*Id.*) Dr. Sheikh's impressions were the following: history of depression, history of suicidal ideation and suicide attempt, multiple joint pain due to arthritis, and diabetes. (R. 354.) The doctor also suggested that Plaintiff might suffer from degenerative disc disease. (*Id.*)

The record also includes some medical records from Gary Community Health Center, where Plaintiff received treatment between May 12, 2008 and March 5, 2009. (*See* R. 361-63.) On May 12, 2008, Plaintiff was prescribed amitriptyline and

fluoxetine for her depression, and naproxen for her pain. (R. 363.) On August 7, 2008, Plaintiff complained of chest, leg, and back pain. (R. 362.) On March 5, 2009, Plaintiff complained of chest, back, and groin pain. (R. 361.) Plaintiff also reported that she needed to sit down frequently in order to catch her breath. (*Id.*)

Plaintiff visited the John H. Stroger, Jr. Hospital Emergency Room for medical care between August 6, 2009 and November 2, 2009. (*See* R. 367-79.) On August 6, 2009, Plaintiff complained of lower back pain and breast pain. (R. 379.) She reported that her pain was "6-8" out of ten in terms of severity. (*Id.*) On August 10, 2009, Plaintiff complained of back pain that worsened when she changed positions. (R. 374.) On October 20, 2009, Plaintiff complained of lower back, right hip, right leg, and chest pain. (R. 371.) On November 2, 2009, Plaintiff reported that she needed her medications refilled and complained of lower back pain and soreness in her rib cage when inhaling. (R. 369.) The report indicates that Plaintiff had no tenderness in her lower back. (R. 367.)

### C.   **ALJ Decision**

In his findings, the ALJ found that Plaintiff met the disability insured status requirements of the Social Security Act through December 31, 2012. (R. 11.) The ALJ also determined that Plaintiff had not engaged in substantial gainful activity since her alleged disability onset date. (*Id.*) The ALJ concluded that Plaintiff's obesity and affective disorder constituted severe impairments. (*Id.*) The ALJ recounted some of Plaintiff's medical history, including records that reported complaints and/or diagnoses of Plaintiff's chronic back pain, major depressive

13

disorder, anxiety, osteoarthritis, anemia and obesity. (R. 12-13.) The ALJ also referenced several consultative evaluations. (R. 12.)

The ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments. (R. 13.) Specifically, the ALJ found that Plaintiff's depression did not result in a least two of the following: marked restriction of activities of daily living, marked difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence, or pace, or repeated episodes of demonpensation. (*Id.*) The ALJ determined that Plaintiff had the residual functional capacity "to lift/carry no more than 50 pounds occassionally and 25 pounds frequently and needs to avoid moving and dangerous machinery." (*Id.*) In terms of Plaintiff's credibility, the ALJ stated the following: "I find that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms. However, the claimant's statements concerning the intensity, duration, and limiting effects of these symptoms are not entirely credible." (*Id.*) The ALJ indicated that he gave "significant weight to the state agency medical consultant's opinion for medium work since it is consistent with the medical record." (R. 14.)

The ALJ concluded that Plaintiff was unable to perform any past relevant work, but determined that "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant number in the national economy that the claimant can perform." (R. 15.) As such,

14

the ALJ found that Plaintiff had not been under a disability, as defined in the Social Security Act, from August 9, 2007 through the date of his decision.

## DISCUSSION

### I.    ALJ LEGAL STANDARD

Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42. U.S.C. § 423(d)(1)(a). In order to determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed?  (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work?  20 C.F.R. § 416.920(a)(4) (2008).

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). A negative answer at any step, other than at step 3, precludes a finding of disability. *Id.* The claimant bears the burden of proof at steps 1-4. *Id.*

Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the ability to engage in other work existing in significant numbers in the national economy. *Id.*

## II.    JUDICIAL REVIEW

Section 405(g) provides in relevant part that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are support by substantial evidence or based upon legal error. *Clifford v. Apfel,* 227 F.3d. 863, 869 (7th Cir. 2000); *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Skinner*, 478 F.3d at 841.

The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind her decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). In cases where the ALJ denies benefits to a claimant, "he must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. The ALJ "must at least minimally articulate the analysis for the evidence

with enough detail and clarity to permit meaningful appellate review." *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Murphy v. Astrue*, 498 F.3d 630, 634 (7th Cir. 2007) ("An ALJ has a duty to fully develop the record before drawing any conclusions, and must adequately articulate his analysis so that we can follow his reasoning.").

Where conflicting evidence would allow reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the court. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). However, an ALJ may not "select and discuss only that evidence that favors his ultimate conclusion," but must instead consider all relevant evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).

## III.   ANALYSIS

In her motion for summary judgment, Plaintiff alleges a number of errors related to the ALJ's determination, including: (1) the ALJ's credibility determination was flawed; (2) the ALJ failed to consider some of Plaintiff's impairments and failed to discuss significant evidence in the record; and (3) the ALJ failed to properly analyze Plaintiff's mental impairment.

### A.   Credibility

An ALJ's credibility determination is granted substantial deference by a reviewing court unless it is "patently wrong" and not supported by the record. *See Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000); *see also Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir.

2006) (quoting *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006)) ("'Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed.'"). However, an ALJ must give specific reasons for discrediting a claimant's testimony, and "[t]hose reasons must be supported by record evidence and must be 'sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'" *Lopez* ex rel. *Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003) (quoting *Zurawski*, 245 F.3d at 887-88).

When assessing the credibility of an individual's statements about symptoms and their functional effects, an ALJ must consider all of the evidence in the case record. *See* SSR 96-7p.[1] "This includes . . . the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists . . . and any other relevant evidence in the case record." *Id.* at *1. In instances where the individual attends an administrative proceeding conducted by the adjudicator, the adjudicator may also consider his or her own observations of the individual as part of the overall evaluation of the credibility of the individual's statements. *Id.* at *5.

---

[1] Interpretive rules, such as Social Security Regulations ("SSR"), do not have force of law but are binding on all components of the Agency. 20 C.F.R. § 402.35(b)(1); *accord Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999).

Plaintiff argues that the ALJ's credibility analysis was erroneous in that it included a meaningless boilerplate statement and because the ALJ failed to consider critical evidence and articulate his reasoning. Defendant contends that while the Seventh Circuit has remanded cases based upon the employment of the same credibility boilerplate statement utilized in this case,[2] there has only been remand where the ALJ failed to provide an adequate explanation for his or her credibility finding. In other words, the mere presence of the offending language is insufficient grounds for remand. *See, e.g.*, *Carter v. Astrue*, 413 Fed. Appx. 899, 905-06 (7th Cir. 2011). Here, the use of the boilerplate is, for the most part, incidental. However, while the ALJ supported his credibility determination with reasons, those reasons evidence a serious failure to consider relevant evidence. Furthermore, some of the ALJ's reasons lack necessary specificity and explanation.

Defendant maintains that the ALJ provided the following reasons why Plaintiff lacked credibility: (1) although Plaintiff complained of debilitating headaches, the "record identified no persistent report of headaches," (R. 14); (2) Plaintiff was not compliant with oral medication for diabetes, (*id.*); (3) Plaintiff was

---

[2] The following is the language in question: "Upon considering the evidence of record, I find that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms. However, the claimant's statements concerning the intensity, duration, and limiting effects of these symptoms are not entirely credible." (R. 13.) As alluded to in Plaintiff's memoranda, the "credibility template" has been subject to criticism because of its meaninglessness and the circular logic that it embraces. *See Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012) (finding the template to "get[] things backwards," and be "meaningless boilerplate" that "implies that ability to work is determined first and is then used to determine the claimant's credibility").

not seeing a psychiatrist, (R. 13); (4) there were gaps in Plaintiff's treatment, (R. 13); (5) Plaintiff's complaints of pain were inconsistent with the medical evidence and her "routine and conservative" course of treatment, (R. 14); and (6) Plaintiff's complaints were inconsistent with her activities of daily living, (*id.*).

Contrary to the ALJ's assertion, the record clearly identifies Plaintiff's persistent report of headaches. In addition to her claims at the hearing, there are numerous reports of headaches in her health history and her Disability Reports. (*See, e.g.*, R. 43-44, 169, 364.) Dr. Saavedra noted that "[s]he suffers with frequent headaches" (R. 323), and Dr. Sheikh reported that "[s]he complains of headaches every day." (R. 350.) Additionally, on June 6, 2006, she went to the hospital with a headache as a chief complaint. (R. 239.) On June 4, 2007, Plaintiff reported to her therapist that she had a bad headache that day and that she had suffered from headaches for as long as she could remember. (R. 312.)

The ALJ relied on one report to determine that Plaintiff was not compliant with her diabetes medication. Dr. Saavedra reported that Plaintiff "was diagnosed with diabetes about 4 years [ago] and is on oral medication but [is] unable to buy it at this time." (R. 322.) In his decision, the ALJ did not mention that Plaintiff's noncompliance was due to financial hardship. Social Security Rulings make clear that the ALJ:

> must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may

> explain infrequent or irregular medical visits or failure to
> seek medical treatment.

SSR 96-7p, at *7. Indeed, "[t]he explanations provided by the individual may provide insight into the individual's credibility. For example . . . [t]he individual may be unable to afford treatment and may not have access to free or low-cost medical services." *Id.* at *8. Here, in using this singular instance of Plaintiff's "noncompliance" – which is perhaps better characterized as an inability to comply – as evidence of Plaintiff's incredibility, the ALJ failed to consider evidence of Plaintiff's general compliance with her physicians' recommendations, (*see* R. 302), and improperly neglected to consider evidence of Plaintiff's explanation for her noncompliance.

The ALJ similarly failed to consider evidence of Plaintiff's financial hardship when, in support of his finding that Plaintiff lacked credibility, he noted that Plaintiff was not seeing a psychiatrist and that there were gaps in Plaintiff's treatment. Specifically, the ALJ ignored that prior to losing her insurance, Plaintiff was seeing both a therapist and a psychiatrist regularly, (R. 300-12), and that she testified that she would be seeing a psychologist or psychiatrist if she were financially able. (R. 49.) The ALJ also ignored the fact that on November 13, 2007, Plaintiff told Dr. Saavedra that she could no longer afford to see her psychiatrist because she no longer had insurance. (R. 322.) As Plaintiff points out, the ALJ failed to mention or address that Plaintiff not only lost her insurance, but she was

evicted from her home, was forced to move in with her sister in a different city, and had trouble returning to her previous medical providers. (R. 31, 34.)

The ALJ also based his unfavorable credibility determination upon his determination that Plaintiff's complaints of pain were inconsistent with the medical evidence and her "routine and conservative" course of treatment. (R. 14.) The claimed inconsistency appears to be entirely based on the facts that Plaintiff was never referred for x-rays or MRIs, and that examinations in 2009 did not reveal any musculoskeletal abnormalities. (*Id.*) The ALJ was mistaken, he neglected relevant evidence in the record, and his analysis of Plaintiff's complaints of pain was incomplete. More fundamental than these issues, however, is that the ALJ failed to explain how Plaintiff's complaints of pain were actually inconsistent with these facts from the record. Absent such an explanation, it is extremely difficult, if not impossible, for a reviewing court to determine whether the ALJ's credibility evaluation was supported by substantial evidence. Here, however, it is abundantly clear that this aspect of the ALJ's credibility evaluation is insufficiently supported. First, contrary to the ALJ's assertion, Plaintiff actually *was* referred for an MRI exam. (R. 286.) Second, the "examinations" in 2009 that supposedly did not reveal any abnormalities consist of brief notes made in the course of an emergency room visit. (*See* R. 367.) It is not clear what tests were performed during these visits or how thorough any of these examinations were. Furthermore, the ALJ neglected to consider the numerosity and consistency of Plaintiff's complaints of back, hip, groin, and leg pain, (*see, e.g.*, R. 227, 231, 243, 257, 262, 282, 284-89, 317, 319, 326, 361,

367, 369, 371, 379), as well as her diagnosed arthritis. (R. 258, 282, 286-88, 322, 361.) The ALJ also failed to mention that Plaintiff was referred to a pain specialist because her physician was concerned that the amount of pain medication she was taking would lead to liver damage, (R. 286), and the ALJ did not consider the varying medications Plaintiff took for her pain. In neglecting to factor this evidence into his credibility analysis, the ALJ improperly considered "only that evidence that favor[ed] his ultimate conclusion," *Herron*, 19 F.3d at 333, and ignored the language of SSR 96-7p:

> Because symptoms, such as pain, sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, any statements of the individual concerning his or her symptoms must be carefully considered if a fully favorable determination or decision cannot be made solely on the basis of objective medical evidence.
>
> If an individual's statements about pain or other symptoms are not substantiated by the objective medical evidence, the adjudicator must consider all of the evidence in the case record, including any statements by the individual and other persons concerning the individual's symptoms.

SSR 96-7p, at *1.

The ALJ also asserted that Plaintiff's activities of daily living were inconsistent with her complaints. (R. 14.) While a claimant's activities of daily living might be relevant to the credibility of her claims, courts have cautioned the Social Security Administration against placing undue weight on a claimant's household activities in assessing the claimant's ability to manage the requirements

of a competitive workplace. *See, e.g.*, *Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2009); *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2005); *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005). In this case, however, not only did the ALJ fail to consider the differences – both in degree, and in kind – between, on the one hand, engaging in sporadic physical activities that can be done at one's own pace and leisure, and, on the other hand, working eight hours per day, five days per week, but worse, the ALJ failed to explain any actual inconsistency between Plaintiff's activities and her claimed limitations. Specifically, the ALJ failed to articulate how the Plaintiff's reports that she did housework and cooking are incompatible with her claimed restrictions, including absence from work two or more days per month, the need to lie down up to two hours per day due to migraine headaches, and the inability to lift more than twenty pounds. The Court is unable to discern any inconsistency between Plaintiff's activities and her claimed limitations, and the ALJ provided no explanation.

The ALJ's credibility determination was patently wrong and not supported by the evidence. The ALJ failed to consider relevant evidence, and in several instances, failed to articulate his reasoning. To the extent that the ALJ provided specific reasons for discrediting a Plaintiff's testimony, those reasons were based on inaccurate, mischaracterized or incomplete information. The ALJ's decision makes clear that if all or some of Plaintiff's claims were found to be credible, a finding of disability would be virtually inevitable. The Court therefore finds that this case

must be remanded back to the Commissioner for a full and fair analysis of Plaintiff's credibility, consistent with relevant statutes, regulations, and case law.

## B.   <u>Unconsidered Impairments</u>

When determining a disability claimant's RFC, "the ALJ must consider all medically determinable impairments, physical and mental, even those that are not considered 'severe.'" *Craft v. Astrue*, 539 F.3d 668, 677 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(2), (b), (c)). The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). The RFC is an assessment of what work-related activities the claimant can perform despite his limitations. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). A claimant's RFC is to be "based on all the relevant evidence in the record." *Id.* at 1001 (citing 20 C.F.R. § 404.1545(a)(1)). Furthermore, the RFC assessment is to "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts." SSR 96-8p, at *7. Where an ALJ does not discuss, or "grapple with" significant evidence in the record, the ALJ's decision should be reversed for consideration of that evidence. *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995).

The ALJ failed to discuss significant evidence in the record. First, as is mentioned above, the ALJ dismissed Plaintiff's assertion of persistent, debilitating migraine headaches. The ALJ claimed that "[t]he record identified no persistent report of headaches," (R. 14), however, the record contained significant evidence of

Plaintiffs's consistent complaints of headaches. (*See, e.g.*, R. 169, 239, 285, 287, 289, 312, 322, 323, 350, 364.)

Second, the ALJ improperly failed to analyze evidence of Plaintiff's fatigue and fatigue-related impairments. *See Holland v. Barnhart*, No. 02 C 8398, 2003 WL 22078383, at *9 (N.D. Ill. Sept. 5, 2003) ("[The ALJ's failure to discuss [claimant's] fatigue and how it might affect her job performance precludes us from evaluating whether there is substantial evidence to support the ALJ's findings."). Plaintiff testified that she feels fatigued several times a week, needs to lie down between household tasks, and falls asleep during the day due to the side effects of her medication. (R. 34, 39, 41, 48.) The record evidences consistent complaints of fatigue and shows that Plaintiff has taken and is currently prescribed several medications of which drowsiness is a side effect, including Lexapro, Altace, hydrocodone, Lipoderm, Metformin, nabumetone, Seroquel, trazadone, and clonazepam. (R. 174.) Additionally, the record reveals that Plaintiff suffers from chronic anemia, of which fatigue is a common symptom. (R. 238, 240-41, 250, 254, 284, 289.) The ALJ's failure is especially relevant in this case because the Vocational Expert testified that all jobs would be ruled out if Plaintiff required time to lay down during the workday for up to two hours, twice per week. (R. 55.)

Third, the ALJ failed to properly analyze the combination of Plaintiff's impairments, most notably obesity in conjunction with diabetes, fatigue, anemia, and arthritis. The ALJ states the following: "Of note, despite BMI over 40 (height of 4'11" and weight ranging 205-212 pounds), I find no exacerbating effect of obesity on

her functioning." (R. 14.) In support of his finding, the ALJ explained that two examinations showed no musculoskeletal abnormalities, and that "the record identified no respiratory problem during the period under consideration." (*Id.*) However, the record does indicate respiratory problems, in that Plaintiff complained of shortness of breath, (*see, e.g.*, R. 268, 289, 323, 351), and was diagnosed with asthma and prescribed albuterol. (*See* R. 246, 248.) Furthermore, the fact that some examinations failed to reveal objective medical evidence of the exacerbation of Plaintiff's impairments allegedly caused by her obesity is not dispositive of the issue, especially when the nature and thoroughness of those examinations are suspect.[3] As is mentioned above, the ALJ failed to consider extensive evidence of Plaintiff's pain that should have factored into the ALJ's analysis.

Additionally troubling is the fact that aspects of the ALJ's decision concerning Plaintiff's obesity are internally inconsistent. At step two of the five-step sequential evaluation process for determining disability, the ALJ determined that Plaintiff's obesity constituted a severe impairment. "A severe impairment is an impairment or combination of impairments that 'significantly limits [one's] physical or mental ability to do basic work activities.'" *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting 20 C.F.R. § 404.1520(c)). While the ALJ explicitly

---

[3] As mentioned above, records of the "examinations" in question consist of brief notes made in the course of one or two emergency room visits. (*See* R. 367.) It is not clear what tests were performed during these visits or how thorough any of these examinations were.

determined that Plaintiff's obesity was a severe impairment, he found that it had

"no exacerbating effect . . . on her functioning."[4] (R. 14.) The Court is unable to

reconcile these statements or follow the ALJ's reasoning. Therefore, the matter

must be remanded to the Commissioner for a thorough consideration of all of the

medical evidence in the record and a detailed explanation of why certain evidence

was given greater or lesser weight. The ALJ should also, if necessary, give the

parties the opportunity to expand the record so that he may build a "logical bridge"

between the evidence and his conclusions. *Myles v. Astrue*, 582 F.3d 672, 678 (7th

Cir. 2009).

### C.    **Plaintiff's Mental Impairment**

Plaintiff also argues that the ALJ's failure to apply the "special technique" to

Plaintiff's depression constitutes reversible error. The special technique is set forth

in 20 C.F.R. § 404.1520a, "and it is used to analyze whether a claimant has a

medically determinable mental impairment and whether the impairment causes

functional limitations." *Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008). The

special technique is used to evaluate mental impairments at steps two and three of

the five-step evaluation. *Id.* If the claimant has a medically determinable mental

impairment, then the ALJ must document that finding and rate the degree of

---

[4] The Social Security Administration "has removed obesity as a separate
listing from the list of disabling impairments." *Castile v. Astrue*, 617 F.3d 923, 928
(7th Cir. 2010) (citing SSR 02-1p). However, the ALJ is required to consider a
claimant's obesity in evaluating the severity of her other impairments. *Id.* In any
event, the ALJ makes contradictory determinations regarding the impact of
Plaintiff's obesity.

functional limitation in four broad areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3).

> If the ALJ rates the first three functional areas as none or mild and the fourth area as none, then generally the impairment is not considered severe. Otherwise, the impairment is considered severe, and the ALJ must determine whether it meets or is equivalent in severity to a listed mental disorder. If the mental impairment does not meet or is not equivalent to any listing, then the ALJ will assess the claimant's RFC. The ALJ must document use of the special technique by incorporating the pertinent findings and conclusions into the written decision. The decision must elaborate on significant medical history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the mental impairment's severity. The decision must also incorporate "a specific finding as to the degree of limitation in each of the functional areas."

*Craft*, 539 F.3d at 675 (quoting 20 C.F.R. § 404.1520a(e)(4)).

Here, at step two of the five-step sequential evaluation process for determining disability, the ALJ determined that Plaintiff's depression constituted a severe impairment. (R. 11.) At step three, the ALJ determined that Plaintiff's depression had "not resulted in at least two of the following: marked restriction of activities of daily living, marked difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence or pace, or repeated episodes of decompensation." (R. 13.) In other words, the ALJ found that Plaintiff's mental impairments did not meet or medically equal a listed impairment. The ALJ's one-sentence step-three determination of Plaintiff's mental impairment lacks

29

any analysis, is conclusory, and–as Plaintiff suggests–is at odds with what is required under 20 C.F.R. § 404.1520a and the Seventh Circuit's decision in *Craft*. While the ALJ deployed some of the terminology of 20 C.F.R. § 404.1520a, the ALJ did not mention, utilize or apply the special technique. He failed to explain how Plaintiff's history, examination and laboratory findings, and functional limitations resulted in the ALJ's determinations regarding the severity of Plaintiff's mental impairment. Furthermore, the ALJ's decision did not include a specific finding as to the degree of limitation in each of the functional areas.

Defendant claims that, "to the extent that the depth of the ALJ's discussion is found wanting, [Plaintiff] has failed to establish that reversal is warranted." (Def.'s Resp., at 4.) The Seventh Circuit has suggested that, under some circumstances, "the failure to explicitly use the special technique may indeed be harmless error." *Craft*, 539 F.3d 668, 675 (7th Cir. 2008) (citing *Keys v. Barnhart*, 347 F.3d 990, 994 (7th Cir. 2003)). Here, however, the Court cannot conclude that the error was a harmless one because "the ALJ's failure to consider the functional impairments during the special technique analysis was compounded by a failure of analysis during the mental RFC determination." *Id.* The ALJ's failure during the mental RFC determination was two-fold. First, just as the ALJ's determinations regarding Plaintiff's obesity were inconsistent, his determinations regarding Plaintiff's depression are irreconcilable as well. The ALJ determined that, although Plaintiff's depression constituted a severe impairment, Plaintiff's RFC was inexplicably unaffected by her depression. (R. 13.) Second, the ALJ's flawed credibility analysis –

specifically, the ALJ's aforementioned failure to consider the Plaintiff's explanations for the gaps in her treatment and the fact that she was not seeing a psychiatrist at the time of the hearing – tainted his conclusions regarding Plaintiff's mental residual functional capacity. The evidence in the record could reasonably support a finding of disability based (solely, or partly) on Plaintiff's mental impairment. As such, remand is necessary so that the ALJ may use the special technique to evaluate Plaintiff's mental impairment.

The Court expresses no opinion about the decision to be made on remand but encourages the Commissioner to use all necessary efforts to build a logical bridge between the evidence in the record and his ultimate conclusions, whatever those conclusions may be. *Myles*, 582 F.3d at 678; *see Smith v. Apfel,* 231 F.3d 433, 437 (7th Cir. 2000); *Luna v. Shalala,* 22 F.3d 687, 693 (7th Cir. 1994). The Court further emphasizes that this opinion is limited to three major errors justifying remand. The Commissioner should not assume that any other claimed errors not discussed in this order have been adjudicated in his favor. On remand, the Commissioner therefore must carefully articulate his findings as to every step.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff's motion for summary judgment [Doc. No. 21] is granted in part and denied in part. The Court finds that this matter should be remanded to the Commissioner for further proceedings consistent with this opinion.

**SO ORDERED.**                    **ENTERED:**


**DATE:**   September 4, 2012   _____

                                   **HON. MARIA VALDEZ**
                                   **United States Magistrate Judge**